# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JOY R. GOELLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-19-491-SM** |
| | ) | |
| **ANDREW M. SAUL,** | ) | |
| **Commissioner of Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Joy Goeller (Plaintiff) brings this action for judicial review of the Commissioner of Social Security's final decision that she was not "disabled" under the Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d)(1)(A). The parties have consented to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b)(1)(B) and (C). Docs. 11, 14.

Plaintiff maintains the ALJ misevaluated the medical evidence and "erred in his consistency analysis." Doc. 17, at 9-23. After a careful review of the record (AR), the parties' briefs, and the relevant authority, the court affirms the Commissioner's decision. *See* 42 U.S.C. § 405(g).[1]

---

[1]     Citations to the parties' pleadings and attached exhibits will refer to this Court's CM/ECF pagination. Citations to the AR will refer to its original pagination.

## I.    Administrative determination.

### A.    Disability standard.

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."    42 U.S.C. § 423(d)(1)(A).    "This twelve-month duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just h[er] underlying impairment." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Barnhart v. Walton*, 535 U.S. 212, 218-19 (2002)).

### B.    Burden of proof.

Plaintiff "bears the burden of establishing a disability" and of "ma[king] a prima facie showing that [s]he can no longer engage in h[er] prior work activity." *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985).    If Plaintiff makes that prima facie showing, the burden of proof then shifts to the Commissioner to show Plaintiff retains the capacity to perform a different type of work and that such a specific type of job exists in the national economy. *Id.*

**C.    Relevant findings.**

**1.    Administrative Law Judge's findings.**

The ALJ assigned to Plaintiff's case applied the standard regulatory analysis to decide whether Plaintiff was disabled during the relevant timeframe.  AR 19-37; *see* 20 C.F.R. § 404.1520(a)(4); *see also Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (describing the five-step process).  The ALJ found Plaintiff:

(1)    had not engaged in substantial gainful activity since July 15, 2015, the alleged onset date;

(2)    had the severe impairments of degenerative disc disorder, fibromyalgia, obesity, non-insulin diabetes mellitus, anxiety disorder, and affective disorders;

(3)    had no impairment or combination of impairments that met or medically equaled the severity of a listed impairment;

(4)    had the RFC to perform sedentary work with the following nonexertional limitations:  can only perform simple, routine, and repetitive tasks; can have occasional interaction with co-workers, supervisors, and public; and must be free of production rate pace;

(5)    she could perform no past relevant work;

(6)    could perform jobs that exist in significant numbers in the national economy, namely document preparer, envelope stuffer, and table worker; and so

(7)    was not disabled from July 15, 2015 through August 23, 2018.

AR 19-37.

### 2. Appeals Council's findings.

The SSA's Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. *Id.* at 1-5; *see* 20 C.F.R. § 422.210(a).

## II. Judicial review of the Commissioner's final decision.

### A. Review standard.

The court reviews the Commissioner's final decision to determine "whether substantial evidence supports the factual findings and whether the ALJ applied the correct legal standards." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084; *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (internal quotation marks and citation omitted)). A decision is not based on substantial evidence "if it is overwhelmed by other evidence in the record." *Wall*, 561 F.3d at 1052 (citation omitted). The court will "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Newbold v. Colvin*, 718 F.3d 1257, 1262 (10th Cir. 2013) (citation omitted).

## B. Issues for judicial review.

### 1. The ALJ adequately considered the medical evidence.

Plaintiff's argument centers around the ALJ's consideration of Dr. Newey's medical source statements that placed significant restrictions upon Plaintiff. The ALJ must give a treating physician's opinion controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record." *Allman v. Colvin*, 813 F.3d 1326, 1331 (10th Cir. 2016) (internal quotation marks omitted). If the ALJ decides, however, that "the treating physician's opinion is not entitled to controlling weight, the ALJ must then consider whether the opinion should be rejected altogether or assigned some lesser weight." *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007). Here, the ALJ gave Dr. Newey's opinions "little to no weight." AR 35.

### a. Medical records prior to the onset date.

The ALJ made the following observations regarding Plaintiff's medical visits before the onset date.

- July 7, 2009: P.A.C. Gina Hernandez saw Plaintiff for weight management – Plaintiff reported fatigue, aches, and pains and wanted testing to determine the source.

- July 16, 2009: Plaintiff had read a booklet regarding fibromyalgia and reported that most of the symptoms "was what she was having"; she reported still taking Lorcet and Xanax; she had stable vital signs, no acute distress, regular heart rate, and clear lungs.

- April 15, 2013: Dr. Newey reported Plaintiff was well-nourished, well-developed, alert, oriented, and in no acute distress; normal physical examination with unlabored breathing, regular heart rate and no murmurs; grossly oriented to person, place, and time; normal communication ability; normal attention, intact concentration abilities; normal gait and appropriate affect; assessed with major depression (single episode) and prescribed Celexa.

- September 23, 2013: she received a release to return to work on September 25, 2013, with no restrictions.

- October 9, 2013: Plaintiff showed normal cervical range of motion; normal thyroid gland size, nontender, no nodules or masses present; unlabored breathing.

- October 31, 2014: MRI of lumbar spine showed mild early posterior disc building at L5-S1 and a posterior annular fissure at the 6 o'clock position; mild effacement of the anterior thecal sac but no significant degree of canal stenosis; subtle narrowing of the left neural foramen; impression was subtle narrowing of the left neural foramen at L5-S1; mild effacement of the anterior thecal sac at this level; subtle posterior disc bulging at L3-4 and L4-5 without associated canal or foraminal stenosis.

- November 21, 2014: Plaintiff presented to Mercy Clinic Ardmore to establish care and for low back pain; physical examination showed she was in no apparent distress; she had mental status of alert, oriented to person, place, and time, affect was appropriate to mood. Adam Savage, M.D., assessed the claimant with chronic pain, lumbar intervertebral disc disease and lumbar spinal stenosis, lumbar spondylosis and lumbar radiculopathy, joint arthralgia, and rheumatoid arthritis.

- December 12, 2014: Dr. Newey reported normal physical examination, but noted lower spinal tenderness, scoliosis or kyphosis; decreased spine range of motion; paraspinal muscle strength and tone were within normal limits; unlabored breathing; normal lower extremities strength and tone and no atrophy; reflexes were 2+; negative Babinski response; normal gait and was able to stand without difficulty; normal mood and appropriate affect. Dr. Newey assessed the claimant with lumbar degenerative disc disease and generalized anxiety disorder and prescribed Norco.

- April 30, 2015: Plaintiff received a return to school with no restrictions note on May 4, 2015.

- May 15, 2015 and June 15, 2015: Plaintiff was in no acute distress; cervical range of motion was within normal limits; extremities had no edema or cyanosis; Dr. Newey assessed Plaintiff with lumbar degenerative disc disease and refilled her medications; Plaintiff decided to try trigger point injections; she had previously been treated with pain medications that were partially effective in relieving her pain.

*Id.* at 25-26.

### b. Medical records after the alleged onset date through October 24, 2016.

The ALJ made the following observations about Plaintiff's medical records after the alleged onset date, through October 24, 2016:

- July 17, 2015: Plaintiff visited Dr. Newey with complaints of chronic back pain, depression, neuropathy, and sacroiliac pain. She reported her pain developed acutely several years ago and was 8/10 in severity, and has an aching quality and does not radiate. Plaintiff was 5 feet 6 inches tall, weighed 293 pounds with body mass index of 47.29 and blood pressure of 130/84. She was well nourished, well developed, alert, and in no acute distress. Cervical range of motion was within normal limits. She had lower spinal tenderness, scoliosis or kyphosis present. Spine range of motion was decreased. Stability showed no subluxations present. Muscle strength/tone showed paraspinal muscle strength and tone within normal limits, paraspinal muscle tone within normal limits. She was grossly oriented to person, place and time. Her attention was normal, concentration abilities were normal. Right lower extremity strength was normal. She had normal tone and no atrophy in her right lower extremity and left lower extremity. She had negative Babinski response in her right and left lower extremities with reflexes of 2+ in knees and ankles. The claimant had a normal gait, and she was able to stand without difficulty. Her mood was normal, and her affect was appropriate. Dr. Newey assessed the claimant with lumbar degenerative disc disease and prescribed her Duragesic transdermal patch, Lyrica, and Norco.

- August 18, 2015: Plaintiff presented for evaluation of fibromyalgia. She stated she began to experience dizziness and dysmenorrhea approximately years ago. She was tender in the left anterior cervical, right anterior cervical, left greater trochanter, right greater trochanter, left posterior knee, right posterior knee, left 2nd rib, and right 2nd rib tender points. Her medications included Lyrica. Upon examination, the clamant was alert and in no acute distress. Her ribs had normal appearance, bilateral 2nd rib tenderness. She had no rib instability present on palpation. She had painless arc of motion in all planes, with no crepitance. Paraspinal muscle tone was within normal limits, tender upper and lower back. Sensation was intact to light touch in extremities and pinprick sensation was intact to pinprick in extremities. Her gait was normal. Dr. Newey assessed the claimant with fibromyalgia.

- February 16, 2016: Plaintiff had transthoracic echocardiography at Duncan Regional Hospital that showed left ventricle cavity size was normal. Systolic function was normal. The estimated ejection fraction was 55-65%. Right ventricle cavity size was normal. Systolic function was normal. Systolic pressure was within the normal range. No significant valvular disease was indicated.

- April 7, 2016: Baha Abu-Esheh, M.D., saw Plaintiff for a neurology evaluation. Plaintiff did not feel well, had decreased energy level and was not sleeping well; she reported she lost her son 3 years ago, due to suicide. She reported her health/life had fallen apart since March of 2015, but she had worsening of all of her symptoms over the last six months. Upon examination, she was 66 inches tall, weighed 302 pounds, with body mass index of 48.74. She was alert, cooperative, well groomed; she was not in acute distress; her speech was normal. She was oriented to time, place, and person. Visual acuity and fields were normal. Impression was memory change. She has fibromyalgia and on narcotics, which can contribute to her memory problems. She has depression and anxiety, which are not well controlled, and both can affect her memory. She has hypersomnia and snores at night. She likely has sleep apnea.

- April 13, 2016: Plaintiff had a normal EEG.

- April 18, 2016: Plaintiff underwent an MRI of the brain due to memory change; results were normal.

- May 5, 2016: Plaintiff was feeling well with minor complaints; she had good energy level; was sleeping well; had been compliant with instructions; and

she had no current side effects from medications. She sleeps 8 hours per night. She had mild emotional impact and mild physical impact of disease. She reported that her memory had remained the same since her last visit. Dr. Abu-Esheh assessed the claimant with memory change, chronic narcotic use, fibromyalgia, anxiety and depression. EEG and MRI of the brain were normal. She has a lot of stress and anxiety. She takes Lexapro and Xanax. Dr. Abu-Esheh told the claimant her low THS, Xanax, Norco and stress could all contribute to stress. She was asked to check with her primary care physician on THS level. She was continued on medications and was given warning regarding side effects of prescribed medications.

- July 29, 2016: Plaintiff went to Duncan Regional Hospital with chest pain, shortness of breath, and anxiety. James C. Pinkerton assessed the claimant with anxiety, dyspnea, and chest pain. She was to rest; continue home medications, follow up with choice of counselor; follow up with primary care physician; and return to the emergency department with new or worsening symptoms.

- October 14, 2016: Dr. Newey performed fibromyalgia evaluation: Plaintiff stated she began experiencing pain approximately years ago. She reported her pain had consistently been 8/10 during flare-up periods. She had been experiencing moderately severe diffuse pain in the back, knees, lower extremities, shoulders, and torso. She was tender in the left anterior cervical, right anterior cervical, left lateral epicondyle, left 2nd rib, and right 2nd rib tender points.

- Monthly visits October 2015-16: Dr. Newey saw Plaintiff for upper respiratory infections; lumbar degenerative disc disease; fatigue; acute hypopharyngitis; heart failure; sleep apnea; obstructive sleep apnea; memory change; lymphadenitis; hypothyroidism; fibular fracture, and fibromyalgia.

  o During many of these October 2015-2016 examinations, plaintiff was well nourished, well developed, alert, and in no acute distress. Head inspection was atraumatic, normocephalic, she had no tenderness or masses present in her head. Face palpation: no sinus tenderness on palpation. Eyes conjunctive was normal. Eye examination was normal. Ears appeared within normal limits with no lesions present. Hearing was intact to conversational voice in both ears. Oral cavity was normal. Her heart had regular rate

and rhythm, with no murmurs present. Carotid arteries had normal pulses bilaterally. Abdomen was nontender to palpation, no masses present and no hernias present. Neck had no lymphadenopathy present. Ribs were normal in appearance, tenderness 2nd rib. She had no rib instability present on palpation. Pelvis showed no deformities or tenderness present.

- o She had no evidence of pelvis instability. Pelvic musculature strength and tone were within normal limits. Spine stability had no subluxations or other evidence of instability demonstrated during range of motion testing she had tender upper and lower back. Range of motion was painless arc of motion in all planes with no crepitus. Paraspinal muscle tone was within normal limits.

- o Mental examination showed the claimant was grossly oriented to person, place and time. Her memory was intact, immediate recall was intact, long-term recall was intact. Her attention was normal and her concentration abilities were normal. Sensation was intact to light touch in extremities. Pinprick sensation was intact in extremities. The claimant had a normal gait. Her judgement and insight were intact. Her thought content was logical. She had normal mood and appropriate affect.

- October 24, 2016, follow up visit for sacroiliac pain:

- o The claimant reported pain of 8/10 in severity, and has had an aching quality and does not radiate. She denied additional symptoms. The claimant has no prior history of neck or back surgery. She again was well nourished, well developed, alert, and in no acute distress. She had no facial lesions. Cervical range of motion was within normal limits. Thyroid gland size was normal, nontender, no nodules or masses present on palpation. Jugular veins IVP was normal. Her breathing was unlabored, with normal breath sounds. Her heart had regular rate and rhythm, with no murmurs present. Pedal pulses were 2+ bilaterally. Extremities had no edema or cyanosis. She had normal abdominal examination, nontender to palpation, tone normal without rigidity or guarding, no masses present, and no hernias present. Ribs were normal on inspection, normal on palpation without tenderness. She had normal rib stability on palpation. Pelvis had no

deformities or tenderness present. Pelvic stability was normal. Pelvic musculature strength was 5/5. She hand lower spinal tenderness, scoliosis or kyphosis present. Paraspinal muscle strength and tone were within normal limits, paraspinal muscle tone was within normal limits. She had right and left upper extremity shoulder tenderness to palpation. Shoulder, elbow and wrist, joint stability was normal in both left and right upper extremities. Range of motion was normal, with no joint crepitus present, no pain with joint motion in both the right and left upper extremities. Right lower and left lower extremities showed no joint or limb tenderness to palpation, no edema was present, and she had no ecchymosis. Hip, knee and ankle stability were normal. Range of motion was normal, no joint crepitations present, and no pain on motion. She had no skin lesions or areas of discoloration.

o Mental status showed she was grossly oriented to person, place, and time. Her communicative ability was within normal limits, voice quality was normal, articulation of speech was normal, with no aphasias present. Her attention was normal. Concentration abilities were normal. Right lower extremity strength was normal. Right and left lower extremity tone was normal with no atrophy. Right and left lower extremities knee reflex was 2+, ankle reflex was 2+, and Babinski response was negative. Pinprick sensation was intact to light touch in extremities. The claimant had normal gait, was able to stand without difficulty. Her mood was normal and her affect was appropriate. Dr. Newey assessed her with fibromyalgia and lumbar degenerative disc disease.

*Id.* at 26-29.

## c. Dr. Newey's October 24, 2016 Medical Source Statements.

- On October 24, 2016, Dr. Newey completed three medical source statements; each gave Plaintiff a poor prognosis. The ALJ summarized the first, an Arthritis Medical Source Statement:

  o The claimant has symptoms of moderate pain in back, arms, hips, knees, and shoulders. She also has fatigue. The claimant had positive objective signs of fibromyalgia tender points, weight change, and muscle weakness. The claimant's emotional factors contribute to the severity of her symptoms and functional limitations.

  o She has depression affecting her physical condition. She has side effects from medications of drowsiness, pain and muscle weakness. Her impairment has lasted or could be expected to last at least 12 months.

  o Plaintiff could walk without rest or severe pain ¼ a block. She could sit for 20 minutes at one time, stand for 20 minutes at one time, and sit, stand/walk less than two hours total in an 8-hour workday. She would need a job that permitted shifting positions at will from sitting, standing, or walking and she would need to have periods of walking around during an 8-hour working day every 20 minutes for 5-minute duration. She would sometimes need to take unscheduled breaks three times an hour for 10 minutes to lie down and to elevate her feet 2 feet for approximately 40% of an 8-hour working day.

  o Plaintiff could lift and carry less than 10 pounds rarely. She could rarely twist, stoop (bend), and never crouch/squat, climb ladders, or climb stairs. Plaintiff would have significant limitations with reaching, handling, or fingering. Plaintiff could use her hands (right and left) 20% of an 8-hour working day to grasp, turn, twist objects, 90% of the day for fine manipulation, 10% of the day reaching in front of her body and zero% of the time reaching overhead.

  o Plaintiff would be off task for 15% of a typical workday because her symptoms would likely be severe enough to interfere with attention and concentration needed to perform even simple work tasks.

- Plaintiff is incapable of even "low stress" work. Plaintiff's impairment would likely produce "good days" and "bad days." Dr. Newey estimated that Plaintiff, on the average would likely be absent from work more than four days per month as a result of her impairments or treatment.

*Id.* at 29.

- The ALJ summarized Dr. Newey's October 24, 2016 Fibromyalgia Medical Source Statement:

  - Dr. Newey noted that Plaintiff meets the American College of Rheumatology criteria for fibromyalgia. Plaintiff had symptoms and signs associated with conditions of fatigue; chronic widespread pain; muscle weakness; frequent severe headaches; hypothyroidism; anxiety; panic attacks, and depression.

  - Plaintiff has other diagnosed impairments of lumbar degenerative disease. Dr. Newey gave Plaintiff a poor prognosis. Plaintiff's impairment lasted or could be expected to last at least twelve months. Plaintiff had emotional factors that contribute to the severity of Plaintiff's symptoms and functional limitations. Plaintiff had bilateral pain in the lumbosacral spine, cervical spine, thoracic spine, chest, shoulder, arms, hands/fingers, hips, legs, knees/ankle/feet. Dr. Newey noted that Plaintiff had daily moderate pain. Plaintiff had factors that precipitated her pain of fatigue, movement/overuse, cold, stress, and sleep problems. Plaintiff had side effects of drowsiness, lethargy, and nausea. She could walk ¼ a city block without rest or severe pain.

  - She could sit for 15 minutes at one time, stand for 15 minutes at one time, sit for less than 2 hours in an 8-hour workday, and stand/walk less than 2 hours in an 8-hour workday. Plaintiff needed a job that permits shifting positions at will from sitting, standing, or walking. She would need periods of walking around during an 8-hour working day for 10 minutes walking 8 minutes each time. She did not use a cane for assistance. She would need to take unscheduled breaks every 30 minutes for 10 minutes to rest or lie down. With prolonged sitting, she needs to elevate her feet two feet 40% of an 8-hour working day. Plaintiff could rarely lift and carry less than 10 pounds, rarely twist, stoop (bend), never

crouch/squat, climb ladders, or climb stairs, rarely look down, rarely look up, occasionally tu[rn] he[a]d right or left, occasionally hold her head in static position. She could use her right hand and her left hand for grasping turning, twisting objects 20%, finger fine manipulation 90%, arms reaching in front of her body 10%, arms reaching overhead zero%.

o Plaintiff would likely be "off task" 20% of a typical workday due to her symptoms likely being severe enough to interfere with attention and concentration needed to perform even simple work tasks. Plaintiff is incapable of even "low stress" work. Plaintiff's impairments were likely to produce "good days" and "bad days." Dr. Newey estimated if Plaintiff tried to work full time, on the average she would likely be absent from work more than four days per month as a result of her impairments or treatment.

*Id.* at 30.

- The ALJ then summarized Dr. Newey's October 24, 2016 Manipulative Limitations Medical Source Statement:

o Plaintiff had signs or symptoms exhibited that affect her shoulders, elbows, wrists, hands or fingers: tenderness, pain, muscle weakness, and reduced grip strength.

o Plaintiff has moderate sharp pain in her back, shoulders, elbow, hips and knees. Plaintiff can lift <10 pound with her left arm,< 10 pounds with her right arm and <10 pounds with both arms. Plaintiff could use her right and left hands to grasp, turn, twist objects 20%, finger fine manipulation 90%, arms reaching in front of body 0%, and arms reaching overhead zero % in an 8- hour day.

*Id.*

### d.    Dr. Newey's treatment of Plaintiff after October 24, 2016.

- November 2016–May 2017: Dr. Newey continued to treat Plaintiff monthly for her lumbar degenerative disc disease, fibromyalgia, and once for dysphagia.   Plaintiff continued to have normal monthly physical examinations.

  - All examinations through May 2017 showed that Plaintiff was in no acute distress.  She had cervical range of motion within normal limits.  Lower spinal tenderness, scoliosis or kyphosis present.  She [had] no subluxation in stability.  She had some decreased spine range of motion.  Paraspinal muscle strength and tone were within normal limits, paraspinal muscle tone were within normal limits. Pedal pulses were 2+ bilaterally.  She had no edema or cyanosis in her extremities.  She had normal right lower extremity strength. She had normal tone and no atrophy in the right and left lower extremity motor function.  She hand 2+ knee reflexes and 2+ ankle reflexes, with Babinski response negative in the right and left lower extremities.    Sensation was intact to light touch in extremities.

  - She had normal gait and was able to stand without difficulty.  She was grossly oriented to person, place, and time.  Her attention was normal and her concentration abilities were normal.  Her mood was normal and her affect was appropriate.  The claimant denied fatigue; night sweats; double vision; blurred vision; vertigo; recent head injury; abnormal changes in breast size, additional breast symptoms except as noted in the HPI; chest pain; irregular heartbeats; shortness of breath; productive cough; nausea; vomiting; dysuria, or urinary retention.

  - Plaintiff's chief complaints on May 16, 2017 were fibromyalgia, needing sugar level checked, and generalized pain.  She denied any additional symptoms.

*Id.* at 30-31.

### e. Plaintiff's treatment records after May 6, 2017.

The ALJ made the following other findings about the remaining 2017 medical visits:

- May 18, 2017 and June 7, 2017: Plaintiff visited Dr. Kimberly Weaver for gynecological exam/treatment. During both visits, physical examination showed Plaintiff was well developed, well-nourished and in no acute distress. She was alert and cooperating, with normal mood and affect, normal attention span and concentration.

- July 11, 2017: Plaintiff visited Dr. Chris Herndon with a scratchy throat and requested a foot examination (related to her recently diagnosed diabetes) also. She stated her pain was 7 on a scale of 1-10 for her fibromyalgia and denied any other concerns/questions. She complained of joint pain, swelling, arthritis, and muscle aches. She denied difficulty with concentration, poor balance, headaches, and disturbances in coordination, numbness, inability to speak, falling down, weakness, excessive daytime sleeping, and memory loss. She also denied sense of great danger, anxiety, suicidal thoughts, depression, mental problems and thoughts of violent and frightening visions or sounds. Physical examination showed she was well developed, well nourished, and in no acute distress. Her foot exam was normal. Dr. Herndon assessed Plaintiff with type 2 diabetes mellitus, diabetic polyneuropathy, hypothyroidism, and fibromyalgia. He also advised Plaintiff to quit smoking.

*Id.* at 31-33.

### f. Application of the treating-physician rules.

Plaintiff first suggests the ALJ erred in her application of the treating-physician rule. Doc. 17, at 10-11 (emphasizing that the ALJ "must provide specific, legitimate reasons" for rejecting a treating-physician opinion). She then posits medical evidence that she believes supports Dr. Newey's extreme limitations in the MSSs. *Id.* at 14. But the ALJ found Dr. Newey's opinions

were "inconsistent with his own treating/examining notes," showing that Plaintiff "had normal gait and she had the ability to stand without difficulty." AR 35 (citing supporting exhibits); *Bybee v. Berryhill*, No. CIV-16-1138-R, 2017 WL 3447809, at *5 (W.D. Okla. July 24, 2017) (Report & Recommendation) (finding no error in ALJ's rejection of a treating physician's medical opinion where the ALJ identified specific examples of how the physician's opinion was "inconsistent with her own treatment notes and the other medical evidence of record"), *adopted*, 2017 WL 3431854 (W.D. Okla. Aug. 9, 2017). The ALJ considered the entirety of the medical records, shown by his detailed accounts of Plaintiff's medical visits. The ALJ also pointed to inconsistencies with the medical records from Drs. Weaver and Herndon, and to inconsistencies with Plaintiff's reported abilities and activities. AR 35.

At bottom, Plaintiff asks the Court to reweigh the medical evidence, which it cannot do. *See Alarid v. Colvin*, 590 F. App'x 789, 795 (10th Cir. 2014) ("In citing what he contends is contrary evidence [to the ALJ's conclusion regarding the severity of the claimant's impairments,] Mr. Alarid is asking us to reweigh the evidence, which we cannot do."); *Lately v. Colvin*, 560 F. App'x 751, 754 (10th Cir. 2014) (finding ALJ properly rejected treating physician opinion due to its inconsistency and rejecting claimant's attempt to have the court reweigh the evidence); *Taylor v. Astrue*, 266 F. App'x 771, 777 (10th Cir. 2008) (recognizing that case was not "clear-cut" and that the claimant

"certainly adduced evidence consistent with [treating physician's] functional limitations" but the ALJ complied with the regulations in weighing the treating physician's opinion, his decision to reject that opinion was supported by sufficient evidence and "it is not the province of th[e] court to reweigh the evidence").

Plaintiff also argues the ALJ pointed to no other medical opinions that contradicted those of Dr. Newey. Doc. 17, at 15. True, the ALJ gave little weight to the state agency medical physicians' opinions. But that was because those physicians concluded Plaintiff was capable of light work, and the ALJ concluded Plaintiff needed greater restrictions and limited her to only sedentary work. AR 34-35.

Plaintiff also argues that the ALJ did not complete the second step of the treating-physician analysis in only stating she gave Dr. Newey's opinion "little or no weight." Doc. 17, at 18. The ALJ considered whether Dr. Newey's conclusions were consistent with the medical evidence, namely Dr. Newey's own examinations. AR 35. She also noted the "numerous normal physical examinations, reports and medical documentation" citing the medical record. *Id.* (citing *id.* at 356-569, 587-685). The ALJ implicitly declined to give Dr. Newey's opinions controlling weight in giving them "little to no weight."

Plaintiff next challenges the ALJ's recitation of evidence that predated the onset date. She argues the ALJ relied on that evidence, citing a "return to

work" letter that predated the onset period, as a "kitchen sink" approach to discount Dr. Newey's opinion. She avers that "medical evidence that arose before her alleged disability onset has no relevance . . . ." Doc. 17, at 21. Not true. "[E]ven if a doctor's medical observations regarding a claimant's allegations of disability date from earlier, previously adjudicated periods, the doctor's observations are nevertheless relevant to the claimant's medical history and should be considered by the ALJ." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004). Further, it would be error for the ALJ *not* to acknowledge medical evidence predating the onset date because 20 C.F.R. § 404.1520(a)(3) requires the ALJ to "consider all evidence in [the] case record when [she] makes a determination or decision whether [claimant is] disabled" and because the ALJ must "discuss the significantly probative evidence he rejects." *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (internal quotation marks and citation omitted). *See also DeBoard v. Comm'r of Social Security*, 211 F. App'x 411, 414 (6th Cir. 2006)("We do not endorse the position that all evidence or medical records predating the alleged date of the onset of disability. . . are necessarily irrelevant . . . . We recognize that evidence . . . predating the onset of disability, when evaluated in combination with later evidence, may help establish disability." (emphasis deleted)); *Burks-Marshall v. Shalala*, 7 F.3d 1346, 1348 n.6 (8th Cir. 1993)("Evidence from the record of a prior claim may be relevant to a claim of disability with a later onset date.").

The ALJ did not commit error, legal or otherwise, in her treatment of the medical evidence.

## 2.     The ALJ did not err in her consistency analysis.

Plaintiff argues the ALJ's consistency analysis was improper.   In evaluating a claimant's symptoms, the ALJ must determine whether the claimant's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record.   SSR 16-3p.   If they are consistent, then the ALJ "will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities."  *Id.*   If they are inconsistent, then the ALJ "will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities."  *Id.*   Factors the ALJ should consider in determining whether a claimant's pain is in fact disabling include the claimant's attempts to find relief and willingness to try any treatment prescribed; a claimant's regular contact with a doctor; the possibility that psychological disorders combine with physical problems; the claimant's daily activities; and the dosage, effectiveness, and side effects of the claimant's medication. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012); *see also* SSR 16-3p at *7 (listing similar factors); 20 C.F.R. § 416.929(c)(3).   Consistency findings are "peculiarly the province of the finder of fact," and courts should "not upset such determinations when supported by

substantial evidence." *Cowan v. Astrue*, 552 F.3d 1182, 1190 (10th Cir. 2008) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)). As long as the ALJ sets forth the specific evidence he relies on in evaluating the consistency of the claimant's subjective complaints with other evidence, the ALJ "need not make a formalistic factor-by-factor recitation of the evidence." *Keyes-Zachary*, 695 F.3d at 1167 (quotations omitted). "[C]ommon sense, not technical perfection, is [the reviewing court's] guide." *Id.*[2] The ALJ discounted Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms because (1) they were not entirely consistent with the medical evidence and other evidence in the record; and (2) were inconsistent "because the evidence generally does not support the alleged loss of functioning." AR 25. She also concluded that Plaintiff's allegations about her "significant limitations in [her] ability to perform basic work related activities [are] not consistent to the extent alleged." *Id.* at 33.

---

[2]    This evaluation, previously termed the "credibility" analysis, is now termed the "consistency" analysis. *See* SSR 16-3p (superseding SSR 96-7p). In practice, there is little substantive difference between a "consistency" and "credibility" analysis. *See Brownrigg v. Berryhill*, 688 F. App'x 542, 545-46 (10th Cir. 2017) (holding that SSR 16-3p listed "similar factors to consider," and that "[t]he ALJ need not consider these factors in a formalistic way, but the substance must be there," and applying *Keyes-Zachary*). Therefore, Tenth Circuit decisions regarding credibility analyses remain persuasive authority.

Plaintiff maintains the ALJ painted a "rosy" characterization of her activities. Doc. 17, at 25. The ALJ outlined activities Plaintiff engages in despite her alleging disability because of fibromyalgia, rheumatoid arthritis, Hashimoto's disease, back injury, depression, hypothyroidism, severe social anxiety, and sleep disorder:

> [Plaintiff] testified that her spouse takes her and their three daughters around. [She] shops, uses the computer, and uses a Tablet. She prepares cereal, sandwiches and full meals with some assistance and resting during preparation. [She] does household chores, including washing the dishes, and picking up around the house. She uses a shower chair. She occasionally attends children's activities. She reads science fiction novels. She smokes cigarettes. She can lift 15 pounds; can pick up coins later in the day. She cannot zip clothing, but she can tie her shoes. She lives with others and spends time with others. She spends time with her significant other and her adult children. She reported transporting her granddaughter to and from school to her home. [Plaintiff] makes sure her granddaughter is fed, and she watches her play. She lets dogs outside. She drives short distances. She reads and watches television. She goes to doctor's appointments. She reported she could walk ½ a block and then needs to rest for at least 10 minutes.

AR 34 (citing *id.* at 280-87, 296-303).

The ALJ made more than adequate consistency findings and linked those findings to substantial evidence in the record. *See Thompson v. Berryhill*, 685 F. App'x 659, 664 (10th Cir. 2017) (where ALJ evaluates a claimant's subjective complaints and explains evidence he relies on, "[n]othing more is required" for a consistency analysis). Accordingly, the ALJ committed no error in her

consistency analysis of Plaintiff's subjective complaints, or in her conclusion that Plaintiff retained the RFC to perform a reduced range of sedentary work.

**III. Conclusion.**

Based on the above, the court affirms the Commissioner's decision.

**ENTERED** this 14th day of April, 2020.

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE